UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X

ANTHONY ANTONIO FOSTER,

        Plaintiff,              **NOT FOR PUBLICATION**

  -against-                  **<u>MEMORANDUM & ORDER</u>**

FATU SAER DIOP & PAMELA DICKERSON,    11-CV-4731(KAM)(JMA)

        Defendants.

---------------------------------------X

**MATSUMOTO, United States District Judge:**

      On September 26, 2011, *pro se* plaintiff Anthony Antonio Foster ("plaintiff") commenced this civil rights action against Parole Officer Pamela Dickerson ("Dickerson" or "defendant"), in both her individual and official capacities, against Fatu Saer Diop, in her individual capacity ("Diop"), and against Star Security Guard Training Co., pursuant to 42 U.S.C. § 1983, seeking monetary damages, immediate release from custody, and termination of his parole supervision. (ECF No. 1, Complaint dated 9/20/11 ("Compl.").)  By Memorandum and Order dated November 2, 2011, the court dismissed plaintiff's claims against Star Security Guard Training Co. without prejudice. (ECF No. 4, Memorandum and Order dated 11/2/11 ("11/2/11 Mem & Order") at 13.)  On May 10, 2012, plaintiff filed an Amended Complaint against Dickerson and Diop, removing Star Security Guard Training Co. as a defendant, omitting all of his requests

for monetary damages and injunctive relief, and reiterating all of the factual allegations contained in his initial Complaint. (*See generally* ECF No. 19, Amended Complaint ("Am. Compl.").)

Presently before the court is defendant Dickerson's fully-briefed motion to dismiss plaintiff's individual and official capacity claims against her for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (ECF No. 22, Dickerson's Motion to Dismiss ("Def.'s Mot."); ECF No. 23, Memorandum of Law in Support of the Dickerson's Motion to Dismiss ("Def.'s Mem."); ECF No. 24, Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pl.'s Mem."); ECF No. 25, Reply Memorandum of Law in Further Support of Dickerson's Motion to Dismiss ("Def.'s Reply").)

For the reasons that follow, the court grants in part and denies in part defendant's Rule 12(b)(1) and 12(b)(6) motions to dismiss.

---

[1] Although plaintiff was incarcerated during the commencement of this action, the filing of the Amended Complaint, and the briefing of the instant motion, plaintiff was released from custody on parole on October 26, 2012. (*See Foster v. N.Y.C. Prob. Dep't*, No. 11-CV-4732, ECF No. 18, Report and Recommendation at 1 n.1 (E.D.N.Y. Mar. 7, 2013)); *see also* N.Y. Dep't of Corrs. Inmate Finder, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ1/WINQ000(last visited Mar. 31, 2013).

<u>**FACTUAL BACKGROUND**</u>[2]

## I.   <u>Plaintiff's Employment History</u>

In June 2009, Diop, a former parole officer, hired plaintiff as a custodial assistant to aid in the construction of the property located at 1891 Fulton Street in Brooklyn, New York (the "Fulton Street Property"). (Am. Compl. ¶ 1.)  Construction and custodial maintenance of part of the Fulton Street Property was completed on or around July 2009. (*Id.* ¶ 2.)  Thereafter, Diop opened two businesses in the Fulton Street Property: "Star Security Guard Training Program" (the "Guard Training Program") and "6 Point Reduction Driving Defensive Course" (the "Defensive Driving Course"). (*Id.*)  Plaintiff served as a secretary for the two businesses. (*See id.*)

In August 2009, Diop trained plaintiff to be an instructor for the Guard Training Program and Defensive Driving Course. (*See id.* ¶ 3.)  In October 2009, Diop returned to work as an inspector for the New York City Department of Housing Preservation and Development ("HPD") and therefore promoted plaintiff to "Full Time Instructor" for the two businesses. (*Id.* ¶ 5.)  As a result of this promotion, plaintiff prepared documents for both businesses and unofficially instructed the

---

[2] The following facts, taken from plaintiff's Amended Complaint, documents incorporated by reference into the Amended Complaint, and documents within the purview of judicial notice, are assumed to be true for the purposes of defendant's motion to dismiss.

training courses for the businesses. (*Id.*)  In November 2009, plaintiff received a cellular phone from Diop to ensure that plaintiff could provide phone services for the businesses. (*Id.* ¶ 6.)

In or around December 2009, Diop hired plaintiff to provide custodial services at 662 St. Marks Ave. in Brooklyn, New York (the "St. Mark's Property") in exchange for living rent-free in the basement of that building. (*Id.* ¶ 7.) Approximately one month later, in January 2010, Diop informed plaintiff that she was experiencing financial difficulties and that she expected plaintiff to reimburse her for taxes that she allegedly paid on plaintiff's behalf. (*Id.* ¶ 8.)  Diop also began to charge monthly rent in the amount of $500 for plaintiff's continued habitation at the St. Marks Property. (*Id.*)  When plaintiff protested that Diop's demands presented significant hardships and were unfair, Diop terminated him from his employment at the St. Marks Property and directed him to vacate the basement. (*Id.* ¶¶ 8-9.)  Diop, however, urged plaintiff to continue carrying out his employment responsibilities as an instructor for the businesses at the Fulton Street Property. (*Id.* ¶ 9.)  According to plaintiff:

> Diop brought to [plaintiff's] attention her past employment as a Parole Officer, and advised [p]laintiff of [his] best interest to continue [his] employment at Star Security Guard Training Co., and explained

4

> the result of being sent back to prison "if" such "unofficial" duties were mentioned or complained to the proper persons of matter.

(*Id.*)

After vacating the St. Marks Property, plaintiff became homeless and was forced to reside with family and friends. (*Id.*)  Thereafter, plaintiff continued working as an instructor for the Guard Training Program at the Fulton Street Property. (*Id.* ¶ 10.)  At Diop's request, plaintiff began to "plagiarize" documents and courses that would improve the Guard Training Program and benefit the program financially. (*Id.* ¶ 10B.)  Plaintiff further alleges that Diop instructed him to show "favoritism" to participants who shared Diop's "'African' culture and language." (*Id.* ¶ 12.)  In April 2010, Diop was fined by the "Safety Council Department" for unspecified regulatory violations and was further ordered to cease conducting the Guard Training Program. (*Id.* ¶ 11.)

## II.  Plaintiff's May 2010 Meeting with Dickerson

In May 2010, plaintiff attended a scheduled appointment with Dickerson, his parole officer at the time. (*See id.* ¶ 13.)  During that appointment, Dickerson required plaintiff "to take a urinalysis test." (*Id.*)  Plaintiff's urinalysis test results were negative for all drugs tested. (*Id.*)  Moreover, at the appointment, Dickerson informed

plaintiff that Diop had accused him of using drugs and committing theft at the Guard Training Program. (*Id.*)

The following day, plaintiff asked Diop about her accusations of plaintiff's drug use. (*Id.* ¶ 14.) Diop denied having made such accusations and accused Dickerson of lying. (*Id.*) Diop further informed plaintiff that even if she had reported him, Dickerson should not have informed plaintiff of the accusation or her identity. (*Id.*) Notwithstanding Diop's denial, plaintiff believed that Diop "made a desperate attempt to have [plaintiff] in violation of Parole by claiming false and erroneous accusations upon [him]." (*Id.* ¶ 15.)

Plaintiff alleges that because of Diop's allegations regarding plaintiff's drug use, Dickerson referred plaintiff to a drug treatment program called "COM Alert" on July 13, 2010. (*Id.* ¶ 18.) Dickerson informed plaintiff that refusal to participate in the COM Alert program violated the conditions of his parole.[3] (*Id.*) During his participation in the COM Alert program, plaintiff continued to work for Diop and, at her instruction, forged her signature on training certification documents for participants in the Guard Training Program. (*See id.* ¶ 21.) According to plaintiff, Diop directed plaintiff to

_____

[3] Plaintiff concedes that he tested positive for marijuana use in 1996, while he was incarcerated at Fishkill Correctional Facility. (Am. Compl. ¶ 16.) Since 1996, plaintiff has received numerous urinalysis tests during both his incarceration and parole and has not tested positive for drug use. (*Id.*)

forge her signature because she believed she was being
investigated by her employer and that she "no longer had the
availability to make quick stops at the [Guard Training
Program]." (*Id.*)  In addition, Diop had received numerous
complaints from the Department of Criminal Justice that her
training certification documents were consistently late. (*Id.*)
Specifically, plaintiff alleges that, in August 2010, the
Department of Criminal Justice sent an "urgent notice" stating
that the signatures on the documents sent from the Guard
Training Program were not Diop's and that the program was to
cease operation until further notice. (*Id.* ¶ 22.)

III.     **Plaintiff's Arrest and Incarceration**

          On or about August 24, 2010, Diop met with plaintiff
and "created a disturbing scene by yelling and making
threatening provoking statements" before terminating plaintiff's
employment with the Guard Training Program. (*Id.* ¶ 23.)  Three
days later, on August 27, 2010, plaintiff met with Mr. Holiday,[4]
the Chief Inspector of HPD. (*Id.* ¶ 24.)  During that meeting,
plaintiff informed Chief Inspector Holiday that Diop used her
former position as a parole officer to threaten plaintiff and
force him to continue working at the Guard Training Program.
(*See id.* ¶¶ 9, 24.)  Thereafter, Chief Inspector Holiday

---

[4]Plaintiff's Amended Complaint does not provide the first name of
Mr. Holiday.

contacted the New York City Inspector General's Office and briefly explained plaintiff's situation. (*Id.*)  As a result of that call, the Inspector General interviewed plaintiff, who thereafter filed a complaint with the Inspector General. (*Id.*)

During the evening of August 27th, Dickerson and "6 or 7 other Parole Officers" came to his home and arrested him without explanation. (*Id.* ¶ 25.)  During his arrest, plaintiff informed Dickerson of his August 24, 2010 confrontation with Diop and notified Dickerson that he met with Chief Inspector Holiday and the Inspector General on August 27th. (*Id.*) Plaintiff was subsequently taken into custody and detained at Rikers Island. (*Id.*)

Plaintiff alleges that Dickerson visited him during his incarceration at Rikers Island in September 2010. (*Id.* ¶ 26.)  During that visit, Dickerson purportedly served plaintiff with documents setting forth his arrest charges, which plaintiff maintains were false and erroneous. (*Id.*)  Dickerson also informed plaintiff of the charges being brought against him: namely, theft from the Guard Security Program, entering the Fulton Street Property without authorization, and making threats to harm Diop. (*Id.*)  Dickerson then advised plaintiff to stop complaining to his relatives and encouraging those relatives to harass Dickerson. (*Id.*)

Plaintiff further alleges that Dickerson interviewed one of Diop's employees who witnessed the August 24th confrontation between Diop and plaintiff. (*Id.* ¶ 27.) Plaintiff also asserts that the New York City Inspector General's Office informed Dickerson of the City's investigation against Diop. (*Id.*) Finally, plaintiff also claims that Dickerson informed plaintiff and his relatives that she was aware that Diop's "claims were not true." (*Id.*)

## IV.   September 2010 Preliminary Parole Revocation Hearing[5]

On September 2, 2010, the New York State Division of Parole ("Parole Division") held a preliminary parole revocation hearing to discuss plaintiff's alleged parole violation on August 20, 2010, during which he purportedly endangered the safety of and wellbeing of Diop. (Pl.'s Mem., Exh. 1, Transcript

---

[5] In his Opposition to defendant's motion to dismiss, plaintiff annexes the transcript of his September 2010 preliminary parole revocation hearing.  In ruling on defendant's motion to dismiss, the court may properly consider the hearing transcript.  It is well settled that "documents integral to the complaint and those incorporated into the complaint by reference may be considered on a motion to dismiss." *Zynger v. Dep't of Homeland Sec.*, 615 F. Supp. 2d 50, 59 n.9 (E.D.N.Y. 2009) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)), *aff'd*, 370 F. App'x 253 (2d Cir. 2010); *Dutton v. Swissport USA, Inc.*, No. 04-CV-3417, 2005 WL 1593969, at *1 n.1 (E.D.N.Y. July 1, 2005) ("A court may consider documents attached to or integral to the complaint without converting the motion into one for summary judgment.").  Plaintiff's claims against Dickerson in this case are predicated in large part upon Dickerson's testimony and purported misconduct during the preliminary parole revocation hearing.  Indeed, plaintiff's Amended Complaint relies heavily upon the events that took place during the September 2010 hearing and references the content of Dickerson and Diop's testimony. (Am. Compl. ¶¶ 28-29.)  As such, the court may consider the hearing transcript appended to plaintiff's Opposition without converting defendant's motion to dismiss into a summary judgment motion because the transcript is integral to and incorporated by reference into the Amended Complaint.

of September 2010 Preliminary Parole Revocation Hearing ("Tr.") at 1, 3; *see* Am. Compl. ¶ 28.)  During the preliminary hearing, Dickerson, Diop, and plaintiff offered testimony. (*See generally* Tr.)  Plaintiff was represented by legal aid counsel at the preliminary hearing. (*Id.* at 1.)

In his Amended Complaint, plaintiff alleges that during her testimony, Dickerson made "no mention of investigating and interviewing witnesses." (Am. Compl. ¶ 28.) Plaintiff also alleges that Dickerson attempted to coach Diop through the preliminary hearing testimony and made numerous attempts to intimidate plaintiff's legal aid counsel. (*Id.* ¶ 29.)

Plaintiff further alleges that Diop testified falsely at the preliminary hearing that she feared for her life and sought help from the state courts and authorities in Brooklyn. (*Id.* ¶ 28.)  According to the Amended Complaint, Diop testified that the courts and police refused to assist her in dealing with plaintiff because he was a "known murderer." (*Id.*)  Plaintiff, however, maintains that "Diop testified that she never knew that [p]laintiff [had] ever been convicted for manslaughter while being employed for [*sic*] her." (*Id.*)

Plaintiff further alleges that, during the preliminary revocation hearing, Diop presented paperwork related to her criminal complaint filed against plaintiff. (*Id.*)  Plaintiff

asserts that Dickerson failed to review this paperwork prior to issuing a warrant for plaintiff's arrest. (*Id.*)

Finally, plaintiff maintains that Diop's testimony concerning plaintiff's unlawful sale of Guard Training Program certifications was an attempt to cover up Diop's own illegal activity. (*Id.*)  According to plaintiff, to further this "cover-up," Diop reported to the authorities that "[plaintiff] would kill or have her killed if she were to fire [him] or have [him] jailed." (*Id.* (internal quotation marks omitted).)

At the conclusion of the hearing, after the testimony of Dickerson, Diop, and plaintiff, the Hearing Officer lifted the warrant against plaintiff, ordered plaintiff's release from Rikers Island, and reinstated plaintiff's parole. (*See id.* ¶ 29.)

## V.  <u>Plaintiff's Abscondment</u>

Upon his release from custody, plaintiff states that he met with Dickerson and that she "mentioned to [p]laintiff how and what she could have done to keep [p]laintiff incarcerated." (*Id.* ¶ 30.)  Plaintiff claims that, upon his release, numerous people informed him that Diop was disappointed by plaintiff's release and that she had planned to "continue more attempts of having [him] incarcerated." (*Id.* ¶ 31.)

Fearing for his freedom and his life, plaintiff fled from Brooklyn to Middletown, New York. (*Id.*)  He remained in

Middletown until April 2011, at which time he was arrested under a parole warrant for abscondment. (*Id.* ¶¶ 31-32.)  In or around May 2011, during his detention at Orange County Jail, plaintiff was interrogated by detectives from the 81st Precinct in Brooklyn, New York. (*Id.* ¶ 33.)  According to plaintiff, the detectives questioned plaintiff about Diop's allegations that he burglarized the Fulton Street Property. (*Id.*)

On or about May 31, 2011, plaintiff reappeared before the Parole Division for a second parole revocation hearing. (*Id.* ¶ 34.)  Plaintiff was found guilty of absconding and was sentenced to an eighteen-month term of incarceration in state prison. (*Id.*)

## VI.  <u>Relevant Procedural History</u>

On September 26, 2011, plaintiff filed his initial Complaint against Diop, Dickerson, and Star Security Guard Training Co. pursuant to 42 U.S.C. § 1983, alleging unspecified violations of his constitutional rights. (*See generally* Compl.) On November 2, 2011, the court *sua sponte* dismissed plaintiff's claims against Star Security Guard Training Co. with leave to replead. (11/2/11 Mem & Order at 9-10, 13.)  With respect to plaintiff's claims against Dickerson, the court held that the allegations in plaintiff's initial Complaint were "sufficient to state a Section 1983 claim against Officer Dickerson." (*Id.* at 11.)  In particular, the court held that "plaintiff's complaint

12

adequately pleads that Officer Dickerson's conduct, which
resulted in [plaintiff's] allegedly wrongful imprisonment,
'deprived plaintiff of a right guaranteed under the Constitution
of the United States.'" (*Id.* (quoting *Weiss v. Inc. Vill. of Sag
Harbor*, 762 F. Supp. 2d 560, 568 (E.D.N.Y. 2011)).)

On May 10, 2012, plaintiff filed his Amended Complaint
in which he removed Star Guard Training Co. as a defendant,
reasserted his factual allegations as to Dickerson and Diop, and
omitted his requests for monetary damages and injunctive relief.
(*See generally* Am. Compl.)  Defendant now seeks dismissal of
plaintiff's claims against Dickerson pursuant to Rules 12(b)(1)
and 12(b)(6). (*See generally* Def.'s Mem.)

## VII.   <u>Plaintiff's Claims</u>

Plaintiff's Amended Complaint is far from a model of
clarity, and the court is uncertain as to the specific claims
plaintiff wishes to pursue under § 1983.  Liberally construed,
however, the Amended Complaint appears to assert due process,
malicious prosecution, false arrest, and conspiracy claims
against Dickerson pursuant to § 1983.  Although a majority of
plaintiff's claims must fail, the court finds, as it did in its
November 2, 2011 Memorandum and Order, that plaintiff has stated
a plausible claim for false arrest for the reasons set forth
below.

## DISCUSSION

### I.  Standard of Review

#### A.  Rule 12(b)(1)

"'A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.'" *Roman v. C.I.A.*, No. 11-CV-5944, 2013 WL 210224, at *4 (E.D.N.Y. Jan. 18, 2013) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000)).  It is well-settled that the "plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Luckett v. Bure*, 290 F.3d 493, 496 (2d Cir. 2002)).  In reviewing a Rule 12(b)(1) motion to dismiss, the court "must accept as true all material factual allegations in the complaint, but [it is] not to draw inferences from the complaint favorable to plaintiff[]." *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).  Moreover, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits." *Id.*

#### B.  Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "'a complaint must contain sufficient factual matter, accepted as

14

true, to state a claim to relief that is plausible on its face.'" *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although the court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007), plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (alterations in original) (internal quotation marks omitted).

Where, as here, the plaintiff is proceeding *pro se*, courts are obligated to construe the plaintiff's pleadings liberally. *See, e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008); *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).  A *pro se* plaintiff's complaint, although liberally interpreted, still must state a claim to relief that is plausible on its face. *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010).

## II.  <u>The "Favorable Termination" Rule</u>

As a threshold matter, defendant Dickerson contends that to the extent plaintiff seeks damages against her in her individual capacity for any claims predicated on his parole revocation hearings, such claims are barred by the favorable determination rule set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). (*See* Def.'s Mem. at 5-6.)

In *Heck*, the Supreme Court addressed the intersection between the federal habeas corpus statute and § 1983. 512 U.S. at 480.  The Court held that in a suit "to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486-87 (footnote omitted).  Consequently, the *Heck* Court held that claims for damages are not cognizable under § 1983 if the related conviction or sentence has not been invalidated. *Id.* at 487 ("A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.").  This has become

known as the "favorable termination" rule. *See, e.g.*, *Peralta v. Vasquez*, 467 F.3d 98, 100 (2d Cir. 2006).

Pursuant to the favorable termination rule, "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," and, "if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487. This is because the proper vehicle to request relief from illegal confinement is not § 1983, but rather a habeas petition. *See Ingram v. Herrick*, 475 F. App'x 793, 794 (2d Cir. 2012) (citing *McKithen v. Brown*, 481 F.3d 89, 102 (2d Cir. 2007)).  On the other hand, "if the district court determines the plaintiff's cause of action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed." *Heck*, 512 U.S. at 487 (emphasis in original).

The *Heck* Court further explained that a § 1983 "suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction." *Id.* at 487 n.7.  The court explained that because of the presence of the doctrines of

inevitable discovery and harmless error, such a § 1983 action would not "*necessarily* imply that the plaintiff's conviction was unlawful" and, therefore, could proceed. *Id.* (emphasis in original).  The Second Circuit has further confirmed that "a § 1983 action that, at most, increases the *likelihood* that a plaintiff will eventually be able to overturn a still-outstanding conviction, but which does not go so far as to *necessarily* demonstrate the conviction's invalidity" is not barred by the favorable termination rule. *McKithen*, 481 F.3d at 102.

In this action, plaintiff is seeking monetary damages and injunctive relief for Dickerson's alleged violations of his constitutional rights.[6] (Compl. at 5.; *see also* Pl.'s Mem. at 11.)  As alleged in his Amended Complaint, plaintiff's § 1983 claims appear to arise from two separate parole revocation hearings, the September 2010 preliminary revocation hearing and the May 2011 revocation hearing. (Am. Compl. ¶¶ 29, 34.)

As a threshold matter, the court need not determine the applicability of *Heck* to claims arising from the May 2011 revocation hearing because plaintiff fails to allege that defendant Dickerson had any personal involvement in that

---

[6] Although plaintiff omitted his requests for monetary and injunctive relief in his Amended Complaint, the court, as it must, construes his Amended Complaint liberally and incorporates the prayer for relief in plaintiff's original Complaint into his Amended Complaint.

hearing. (*See generally id.*)  Even liberally construed,
plaintiff's Amended Complaint is bereft of any plausible
allegations regarding Dickerson's involvement, much less
misconduct, during plaintiff's May 2011 revocation hearing.
Consequently, to the extent that plaintiff asserts any § 1983
claims against Dickerson arising out of the May 2011 revocation
hearing, such claims fail to state a claim upon which relief can
be granted and are dismissed without prejudice.

          With respect to plaintiff's § 1983 claims arising from
the September 2010 preliminary revocation hearing, the court
finds that such claims are not barred by *Heck*.  Plaintiff
received a *favorable* ruling at the September 2010 hearing
because he was released from custody, and the Hearing Officer
found that there was no violation of plaintiff's parole. (Am.
Compl. ¶ 29.)  As such, recovery on any of plaintiff's § 1983
claims arising from the September 2010 preliminary hearing would
not call into question the validity of any adverse ruling
imposed by any state tribunal.  Nor would plaintiff's success on
any of his § 1983 claims arising out of his September 2010
hearing imply that his more recent eighteen-month incarceration
is invalid.  That eighteen-month incarceratory sentence was
imposed during a different parole revocation hearing regarding a
different parole violation: namely, his abscondment.
Accordingly, to the extent that plaintiff pursues damages claims

arising out his September 2010 preliminary hearing, plaintiff's
action is not barred by *Heck's* favorable termination rule.

III. <u>**Eleventh Amendment Immunity**</u>

Defendants additionally argue that plaintiff's damages
claims against Dickerson in her official capacity are barred by
Eleventh Amendment immunity. (Def.'s Mem. at 15.)

The Eleventh Amendment to the United States
Constitution provides that, "[t]he Judicial power of the United
States shall not be construed to extend to any suit in law or
equity, commenced or prosecuted against one of the United States
by Citizens of another State, or by Citizens or Subjects of any
Foreign State." U.S. Const. amend. XI.  The Supreme Court has
long held that the Eleventh Amendment bars suits against a state
by one of its own citizens, *see Hans v. Louisiana,* 134 U.S. 1,
10-11 (1890), unless a state has consented to suit or there is
an express statutory abrogation of immunity, *see Will v.
Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989).

Furthermore, § 1983 does not "override a State's
Eleventh Amendment immunity" because "a State is not a person
within the meaning of § 1983." *Id.* at 63-64.  In fact, "a suit
against a state official in his or her official capacity is not
a suit against the official but rather is a suit against the
official's office." *Id.* at 71 (citing *Brandon v. Holt*, 469 U.S.
464, 471 (1985)).  The Eleventh Amendment, however, does not bar

a plaintiff from seeking prospective injunctive relief against a state official acting in her official capacity for ongoing violations of federal law. *See State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007); *Dube v. State Univ. of New York*, 900 F.2d 587, 595 (2d Cir. 1990) ("[A] state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar."). "Under the well-known exception to [Eleventh Amendment immunity] first set forth in *Ex parte Young*, 209 U.S. 123 (1908), . . . 'a plaintiff may sue a state official acting in [her] official capacity — notwithstanding the Eleventh Amendment — for prospective, injunctive relief from violations of federal law.'" *Rowland*, 494 F.3d at 95 (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007)).

Here, because § 1983 does not abrogate New York's Eleventh Amendment immunity and New York has not otherwise waived its Eleventh Amendment immunity, all of plaintiff's damages claims against Dickerson in her official capacity are barred by the Eleventh Amendment. *Marmot v. Bd. of Regents*, 367 F. App'x 191, 192 (2d Cir. 2010) ("It is well-established that New York has not consented to § 1983 suits in federal court . . . .").

Additionally, to the extent that plaintiff seeks any claims for prospective injunctive relief against Dickerson, plaintiff's Amended Complaint fails to sufficiently allege any ongoing violation of federal law, much less any ongoing violation perpetrated by Dickerson, sufficient to obtain prospective injunctive relief against Dickerson pursuant to *Ex parte Young*. *See CSX Transp. v. N.Y. State Office of Real Prop.*, 306 F.3d 87, 98 (2d Cir. 2002) ("In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." (internal quotation marks omitted)).  Indeed, the court is unaware of any type of injunctive relief that plaintiff could seek against Dickerson at this juncture as Dickerson's alleged misconduct in connection with plaintiff's September 2010 preliminary revocation hearing, or May 2011 revocation hearing, does not constitute an alleged ongoing violation of federal law.

Consequently, plaintiff's claims against Dickerson in her official capacity are dismissed with prejudice.

## IV.  **Absolute and Qualified Immunity**

Defendant next maintains that plaintiff's damages claims against defendant Dickerson in her individual capacity

are barred either by absolute or qualified immunity.[7]  In the Second Circuit, a state official sued in her individual capacity may be entitled to absolute or qualified immunity depending on the nature of the functions performed by the official. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993).  As such, the court analyzes each form of immunity in turn.

### A.    Absolute Immunity

Defendant Dickerson first contends that she is entitled to absolute immunity for claims based on her improper initiation and presentation of plaintiff's September 2010 preliminary revocation hearings. (Def.'s Mem. at 7.)

"In determining whether state officials are entitled to absolute immunity, courts employ a functional approach, looking at the nature of the function performed, not the identity of the actor who performed it." *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 357 (2d Cir. 2004) (internal quotation marks and citations omitted).  It is well established that "[p]arole officers are entitled to absolute immunity when they perform judicial functions." *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998).  Likewise, "[p]arole

---

[7] Plaintiff's requests for injunctive relief – (1) immediate release from custody, now moot in light of his recent release during the pendency of this action; and (2) termination of his parole supervision – appear to be directed against Dickerson in her official capacity, rather than in her individual capacity.  In any event, plaintiff could not obtain either form of requested injunctive relief against Dickerson in her individual capacity.

officers also receive absolute immunity for their actions in initiating parole revocation proceedings and in presenting the case for revocation to hearing officers, because such acts are prosecutorial in nature." *Id.* at 12; *see also King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999); *Smith v. Duquesnay*, No. 07-CV-2795, 2012 WL 1116450, at *3 (E.D.N.Y. Mar. 30, 2012).  "Acts of parole officers that are investigatory in nature, however, are not protected by absolute immunity." *Walker v. Mendoza*, No. 00-CV-93, 2000 WL 915070, at *5 (E.D.N.Y. June 27, 2000).

Guided by these principles, the court finds that Dickerson's alleged misconduct in initiating plaintiff's revocation hearing and presenting the case for plaintiff's revocation before the Hearing Officer are barred by absolute immunity because such actions are prosecutorial in nature. *See Scotto*, 143 F.3d at 112.  As such, the court dismisses with prejudice plaintiff's malicious prosecution and due process claims to the extent that such claims are founded upon Dickerson's alleged initiation of the September 2010 preliminary revocation hearing as well as her alleged misconduct in pursuit of plaintiff's revocation during that hearing.

B.   **Qualified Immunity**

Defendant Dickerson also contends that she is entitled to qualified immunity for plaintiff's false arrest claims predicated on allegations that Dickerson improperly recommended

the issuance of a warrant against plaintiff without a proper
investigation and subsequently arrested plaintiff without
probable cause. (Def.'s Mem. at 7.)

"The doctrine of qualified immunity protects
government officials from liability for civil damages insofar as
their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known." *Pearson v.* Callahan, 555 U.S. 223, 231 (2009) (internal
quotation marks omitted).  Law enforcement officials enjoy
qualified immunity when they perform investigative rather than
prosecutorial or judicial functions. *Gathers v. White*, No. 04-
CV-5454, 2007 WL 446755, at *6 (E.D.N.Y Feb. 8, 2007) (citing
*Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)), *aff'd sub*
*nom. Gathers v. Burdick*, 308 F. App'x 525 (2d Cir. 2009).
Specifically, law enforcement officers are entitled to qualified
immunity when "(1) it was objectively reasonable for the
officer[s] to believe there was probable cause to make the
arrest, or (2) reasonably competent police officers could
disagree as to whether there was probable cause to arrest."
*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir.
1997).

"Probable cause is established when the arresting
officer has 'knowledge or reasonably trustworthy information of
facts and circumstances that are sufficient in themselves to

warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested.'" *Alvarado v. City of New York*, 453 F. App'x 56, 58 (2d Cir. 2011) (quoting *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987)); *see also Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir. 2010).  In determining whether probable cause existed for an arrest, the court must "consider those facts available to the officer at the time of the arrest and immediately before it." *Alvarado*, 453 F. App'x at 58 (internal quotation marks omitted); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).  An arresting officer may have probable cause "'even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information.'" *Alvarado*, 453 F. App'x at 58 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).  "Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if [s]he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).  On the other hand, "'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Manganiello*, 612 F.3d at 161 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).

Notably, a qualified immunity defense may be asserted on a Rule 12(b)(6) motion "as long as the defense is based on facts appearing on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Nevertheless, "the Second Circuit has emphasized that 'a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route.'" *Poole v. New York*, No. 11-CV-921, 2012 WL 727206, at *5 (E.D.N.Y. Mar. 6, 2012) (quoting *McKenna*, 386 F.3d at 436).  Indeed, courts in this Circuit have acknowledged that a

> defendant asserting a qualified immunity defense at the 12(b)(6) stage . . . faces a formidable hurdle.  Because the evidence supporting a finding of qualified immunity is normally adduced during the discovery process and at trial, the defense of qualified immunity [usually] cannot support the grant of a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim upon which relief can be granted

*McCray v. City of New York*, Nos. 03-CV-9685, 03-CV-9974, 03-CV-10080, 2007 WL 4352748, at *18 (S.D.N.Y. Dec. 11, 2007) (internal citations and quotation marks omitted) (alterations in original).

Drawing all inferences in favor of plaintiff and assuming the truth of all facts alleged in the Amended Complaint, the court finds that qualified immunity is not

warranted at this juncture, particularly in light of the limited record presently before the court.  Plaintiff has alleged that Dickerson failed to properly investigate Diop's accusations and proceeded to arrest him based what she knew to be false accusations, thereby violating clearly established law. (Am. Compl. ¶ 27.)  Most significantly, plaintiff alleges that Dickerson told plaintiff's relatives she was "aware that [Diop's] claims were not true." [8] (*Id.*)  Additionally, plaintiff alleges that Diop demonstrated her lack of reliability through her false accusations about his past drug use. (*Id.* ¶¶ 13, 15, 27.)  Finally, plaintiff alleges that Dickerson "failed to investigate [Diop's accusations] before taking action against plaintiff." (*Id.* ¶ 27.)

Accepting plaintiff's allegations as true and construing the Amended Complaint liberally, plaintiff has alleged that because Dickerson admitted that she knew the accusations against plaintiff were false, Dickerson had a basis to question the veracity and reliability of Diop's accusations and to investigate those accusations further but failed to do so.  Additionally, the Amended Complaint, on its face, does not allege any facts that establish that Dickerson had probable cause, or arguable probable cause, to execute plaintiff's

---

[8] The court, as it must, construes this allegation liberally to assert that Dickerson knew that Diop's accusations were "not true" prior to and during the execution of plaintiff's arrest.

arrest. *See McKenna*, 286 F.3d at 436.   Indeed, assuming the truth of plaintiff's allegations, it would be objectively unreasonable for Dickerson to believe she had probable cause to arrest plaintiff if, as plaintiff alleges, Dickerson knew that the primary bases for executing plaintiff's arrest – Diop's accusations – were false, unreliable, or questionable.   It is well established that "no reasonably competent [] officers could disagree . . . that a parole officer cannot properly rely on evidence he knows to be false." *Scotto*, 143 F.3d at 113 (internal quotation marks and citations omitted).   Although brief, plaintiff's Amended Complaint includes the vital allegation that Dickerson represented to plaintiff and plaintiff's family that she knew Diop's accusations were not true. (Am. Compl. ¶ 27.)   Moreover, plaintiff alleges that Dickerson failed to properly investigate Diop's unreliable accusations. (*Id.*)   In light of these allegations, defendant Dickerson incorrectly asserts that plaintiff fails to allege any "factual basis indicating that Dickerson had any reason to doubt Diop's information before recommending that the arrest warrant be issued."   Accordingly, the court is unconvinced that Dickerson has surmounted the "formidable hurdle" of obtaining qualified immunity on a Rule 12(b)(6) motion to dismiss.   More factual development is necessary to ensure that Dickerson's

29

actions in arresting plaintiff were objectively reasonable under the circumstances.

## V.    Plaintiff's Causes of Action

Having determined that plaintiff's due process and malicious prosecution claims against Dickerson, as currently pled, are barred by absolute immunity, the court need only address the merits of plaintiff's false arrest and conspiracy claims.

### A.    False Arrest

"To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.'" *Escalera*, 361 F.3d at 743 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  In the Second Circuit, the "existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Alvarado*, 453 F. App'x at 58 (citing *Weyant*, 101 F.3d at 852).  Significantly, the Second Circuit has recognized that "the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause" because "arguable probable cause will suffice to confer qualified immunity for the arrest." *Escalera*, 361 F.3d at 743 (internal quotation marks omitted).

30

Construed liberally, plaintiff's Amended Complaint states a plausible false arrest claim under § 1983 as to plaintiff's 2010 arrest.  Specifically, plaintiff alleges that he was unlawfully arrested by Dickerson without justification, explanation, or plaintiff's consent and was subsequently confined at Rikers Island because Dickerson acted on accusations which she allegedly knew to be false or had reason to doubt. (Am. Compl. ¶¶ 25-27.)  These allegations state a plausible false arrest claim.

Moreover, this result is further supported by the court's previous findings in this case.  First, in rejecting defendant's qualified immunity defense above, the court found that plaintiff has adequately pled that Dickerson lacked arguable or actual probable cause.  Assuming plaintiff's allegations are true, if Dickerson lacked *arguable* probable cause, it necessarily follows that Dickerson did not have probable cause to effect plaintiff's arrest. *Escalera*, 361 F.3d at 743.  As such, probable cause does not provide a defense to plaintiff's false arrest claim against Dickerson.

Second, in this court's November 2, 2011 Memorandum and Order partially dismissing plaintiff's claims, the court determined that plaintiff's initial Complaint – which asserted all of the allegations in his Amended Complaint – adequately pled a false imprisonment claim under § 1983. (*See* 11/2/11 Mem &

31

Order at 11.)  This finding is consistent with, and in fact
requires, the court's determination that plaintiff has stated a
cognizable claim for false arrest.  Indeed, "to the extent that
a plaintiff alleges false arrest and false imprisonment [under
§ 1983], they are considered synonymous causes of action."
*Little v. City of New York*, 487 F. Supp. 2d 426, 437 (S.D.N.Y.
2007) (citing *Posr v. Doherty*, 944 F.3d 91, 96 (2d Cir. 1991)).

**B.  Conspiracy**

As a preliminary matter, the court notes that the
nature and basis of plaintiff's conspiracy claim is somewhat
unclear.  On one hand, plaintiff's Amended Complaint specifies
that he brings his action "under the Civil Rights Act 42 U.S.C.
Sec. §1983." (Am. Compl. at p. 1.)  On the other hand, in his
Opposition, plaintiff newly asserts a § 1986 claim, along with
an implied § 1985 conspiracy claim. (Pl.'s Mem. at 7-8.)
Irrespective of this inconsistency, the court finds that
plaintiff fails to state a claim under any of the statutory
bases asserted in his submissions.

**1. Conspiracy Under § 1983**

"To demonstrate that a private party defendant was a
state actor engaged in a conspiracy with other state actors
under § 1983, a plaintiff must allege: (1) an agreement between
the private party and state actors, (2) concerted acts to
inflict an unconstitutional injury, and (3) an overt act in

furtherance of the goal." *Poole*, 2012 WL 727206, at *6; *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (citing *Pangbum v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  Notably, "[v]ague and conclusory allegations that defendants have engaged in a conspiracy to violate plaintiff's constitutional rights must be dismissed." *Poole*, 2012 WL 727206, at *6.  Plaintiff "must allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy." *Elmasri v. England*, 111 F. Supp. 2d 212, 218 (E.D.N.Y. 2000) (internal quotation marks omitted).  "The requisite specificity requires that the plaintiff make an effort to provide some details of time and place and the alleged effect of the conspiracy." *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 513 (S.D.N.Y. 2003) (internal quotation marks omitted).  Moreover, plaintiff must plead "specific facts suggesting that there was a mutual understanding among the conspirators to take action directed toward an unconstitutional end." *Pollack v. Nash*, 58 F. Supp. 2d 294, 302 (S.D.N.Y. 1999) (internal quotation marks omitted).

Plaintiff's allegations fail to state a § 1983 conspiracy claim.  First, plaintiff does not allege the existence of any agreement, either explicit or implicit, between Dickerson and Diop to deprive him of his constitutional rights.

Indeed, "there is not a single allegation as to when, where, or how this conspiracy was formed.  This failure, of course, ignores the basic requirement that there be an agreement or meeting of the minds between the conspirators." *Pollack*, 58 F. Supp. 2d at 302.

Second, plaintiff does not articulate, with the requisite level of specificity, the nature of the alleged conspiracy and has offered minimal details regarding the time, place, and alleged effect of the conspiracy.  Apart from the general allegations, the Amended Complaint lacks any non-conclusory facts sufficient to give rise to a plausible § 1983 claim.  In fact, the only reference in the Amended Complaint to a conspiracy is plaintiff's assertion that Dickerson's attempts to coach Diop during the September 2010 preliminary revocation hearing and intimidate plaintiff's legal aid counsel demonstrated Dickerson's "conspiring efforts to incarcerate Plaintiff." (Am. Compl. ¶ 29.)  Nevertheless, plaintiff's single conclusory allegation does not give rise to a plausible inference that Dickerson and Diop were conspiring to violate plaintiff's constitutional rights either during his arrest or during his September 2010 preliminary revocation hearing.

Consequently, plaintiff's § 1983 conspiracy claims are facially insufficient and must be dismissed.

## 2. § 1985 and § 1986

In his Opposition, plaintiff alters his conspiracy claim and raises new claims pursuant to § 1985 and § 1986, arguing that Dickerson "was fully aware of . . . Diop's conspiring intent to incarcerate" plaintiff but neglected to prevent that conspiracy. (Pl.'s Mem. at 8-9.)  Plaintiff's claims fail as a matter of law.

To state a conspiracy claim under § 1985, plaintiff must allege: "(1) some racial or other class-based discriminatory animus underlying the [defendant's] actions; and (2) that the conspiracy was aimed at interfering with [plaintiff's] protected rights." *Brito v. Arthur*, 403 F. App'x 620, 621 (2d Cir. 2010) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)).  As noted above, plaintiff fails to allege that Dickerson entered into any conspiracy to deprive plaintiff of his constitutional rights. Equally as fatal to plaintiff's § 1985 claim is plaintiff's failure to allege that Dickerson harbored any discriminatory animus based on any of plaintiff's protected characteristics. (*See generally id.*)  As such, plaintiff's Amended Complaint fails to state a claim for relief under § 1985.

Because plaintiff has failed to state a § 1985 conspiracy claim, his derivative § 1986 claim necessarily fails as well. *White v. St. Joseph's Hosp.*, 369 F. App'x 225, 226 (2d

Cir. 2010) ("Insofar as [plaintiff] sought to state a claim
under 42 U.S.C. § 1986, this claim necessarily failed because
[]he failed to state a claim under § 1985."); *K.W. ex rel. Brown
v. City of New York*, 275 F.R.D. 393, 400 (E.D.N.Y. 2011) ("Since
plaintiff's allegation of conspiracy under § 1985 is
insufficient, her derivative § 1986 claim fails.").

<u>**CONCLUSION**</u>

For the foregoing reasons, defendant's Rule 12(b)(1)
and Rule 12(b)(6) motions to dismiss are granted in part and
denied in part as follows:

- The court dismisses with prejudice plaintiff's claims
  against Dickerson in her official capacity for lack of
  subject matter jurisdiction;

- The court dismisses without prejudice plaintiff's claims
  against Dickerson for her alleged misconduct during
  plaintiff's May 2011 revocation hearing for failure to
  state a claim upon which relief can be granted.  The court
  grants plaintiff leave to replead such claims in a Second
  Amended Complaint;

- The court dismisses with prejudice plaintiff's malicious
  prosecution and due process claims against Dickerson
  arising out of Dickerson's initiation of plaintiff's
  September 2010 preliminary revocation hearing and her
  presentation of the revocation case during that hearing as
  barred by absolute immunity;

- The court dismisses without prejudice plaintiff's claims
  pursuant to § 1983, § 1985, and § 1986 for failure to state
  a claim upon which relief can be granted.  The court grants
  plaintiff leave to replead such claims in a Second Amended
  Complaint;

- The court denies without prejudice defendant's motion to
  dismiss plaintiff's false arrest claims as barred by

qualified immunity.  Defendant may renew such a defense in a Rule 56 summary judgment motion that complies with Local Civil Rules 56.1 and 56.2; and

- The court denies defendant's motion to dismiss plaintiff's false arrest claims for failure to state a claim upon which relief can be granted.

Within thirty days of this Order, or by April 30, 2013, *pro se* plaintiff shall serve a Second Amended Complaint in which he may replead any claims dismissed without prejudice, as set forth above.  Plaintiff is further encouraged to provide additional factual allegations in further support of his false arrest claims and to clearly articulate the nature of the claims that he wishes to pursue.

The Clerk of the Court is respectfully directed to serve a copy of this Memorandum and Order on plaintiff at his last known address, 720 Herkimer Street, Apt. # 1B, Brooklyn, New York 11233, which was obtained from the New York Department of Corrections and Community Services.  Upon such service, the Clerk of the Court is requested to note service on the docket.

**SO ORDERED.**

Dated:     March 31, 2013
           Brooklyn, New York

_____/s/_____
Kiyo A. Matsumoto
United States District Judge
Eastern District of New York